1
2
3
4

**WILSON KEADJIAN BROWNDORF LLP**
BENJAMIN M. CUTCHSHAW (SBN 263483)
bcutchshaw@wkbllp.com
1900 Main Street, Suite 600
Irvine, California 92614
Tel:   (949) 247-7832

5
6
7

ANDREW R. CORCORAN (*pro hac* pending)
acorcoran@wkbllp.com
174 Waterfront St., Suite 300
National Harbor, MD 20745
Tel:   (301) 778-1062

8
9

*Attorneys for Plaintiff*
PLUTOS SAMA HOLDINGS, INC.

10

11

12

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

13

14

15

16

17

18

19

20

21

22

| PLUTOS SAMA HOLDINGS, INC., | Case No. 8:19-cv-1010 |
|---|---|
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| TORSTEN MAEHLE; ALEJANDRO WIDMER; JURG WIDMER PROBST; CLEMENS GREGOR; CARLOS POLITANO; ENDRE SZABARI; MICHAEL BEILENSON; and DOES 1–20, inclusive, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

23

24

25

26

27

28

Plutos Sama Holdings, Inc., a Delaware corporation with its principal place of business located in Irvine, California ("Plaintiff" or "PSH"), brings this Complaint against Torsten Maehle ("Maehle"), Alejandro Widmer ("A. Widmer"), Jurg Widmer Probst ("J. Widmer"), Clemens Gregor ("Gregor"), Carlos Politano ("Politano"), Endre Szabari ("Szabari"), and Michael Beilenson ("Beilenson") (collectively, the "Defendants").  Plaintiff alleges as follows:

## NATURE OF THE ACTION

This action arises from an illicit enterprise designed to launder foreign funds through the investment in, and operation of, a legitimate United States business. Defendants' unlawful and tortious conduct has interfered with Plaintiff's legal acquisition and operation of three Italian-themed franchised restaurants (the "Sunshine Transaction") located in Doral, Florida (the "Doral Restaurant"), Miami (Brickell), Florida (the "Brickell Restaurant"), and Reston, Virginia (the "Reston Restaurant") (collectively, the "PSH Restaurants"). In addition, Defendants' conduct has also jeopardized and potentially impaired the value of development rights acquired by Plaintiff to further expand the franchise in Florida, Illinois, New York, New Jersey, Virginia, and Washington, DC (the "U.S. Transaction") and to acquire six additional, currently existing, franchised restaurants. Unbeknownst to Plaintiff, prior to its acquisition of the PSH Restaurants, Defendants J. Widmer, A. Widmer, Gregor, and Maehle (collectively, the "Widmer Enterprise"), engaged in a coordinated effort to launder J. Widmer's ill-gotten gains through the Doral Restaurant.

Plaintiff, through an agreement with the restaurant franchisor, acquired ownership and franchise rights for the PSH Restaurants pursuant to an agreement effective January 7, 2018. Although J. Widmer had previously attempted to take management control over the Doral Restaurant, these efforts had been repeatedly rebuked by the franchisor who refused to allow J. Widmer to have a franchise license. Following PSH's acquisition of the PSH Restaurants, J. Widmer again

attempted to seize control of the Doral Restaurant through a proposed partnership with PSH but that idea was immediately rebuked by the franchisor and, after PSH learned of the background of J. Widmer, was also rejected by PSH. As a result, the Widmer Enterprise, directly or indirectly through the other Defendants, engaged in an aggressive and coordinated attack intended to interfere with Plaintiff's acquisition and operation of the PSH Restaurants. Defendants' actions have caused substantial financial harm to the PSH Restaurants and also jeopardized Plaintiff's larger transaction involving franchise development rights. Plaintiff has already suffered millions of dollars in damages and continues to suffer damages with respect to the PSH Restaurants; there is now substantial risk of greater damages with respect to the larger U.S. Transaction.

## JURISDICTION

1.     The parties' citizenship is completely diverse and the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332.

2.     A substantial part of this action arises under the laws of the United States. 28 U.S.C. §§ 1331 and 1337.

3.     This Court has personal jurisdiction over Defendants and venue is proper in this Court pursuant to 18 U.S.C.A. § 1965(b) because each Defendant has minimum contacts with the United States.

## PARTIES

4.     Plaintiff PSH is a Delaware corporation with its principal place of business located at 1900 Main Street, Suite 640, Irvine, California.

5.     Defendant Maehle was an equity holder of VAP Sunshine prior to the sale of his shares to PSH, is a close friend of A. Widmer (the son of J. Widmer) and is a resident of Miami, Florida.

6.     Defendant A. Widmer is the son of Defendant J. Widmer and is a resident of Miami-Dade County, Florida.

7.     Defendant J. Widmer is a resident of Zurich, Switzerland. Through various shell companies, J. Widmer has invested his illicit bribery proceeds in legitimate U.S. businesses located in Florida.

8.     Defendant Gregor is an attorney that represents J. Widmer and is a resident of Zurich, Switzerland. Defendant Gregor has participated in the Widmer Enterprise's scheme to launder money through legitimate U.S. businesses and has actively participated in the efforts to take control of the Doral Restaurant.

9.     Defendant Politano is the CEO of the U.S. division of the franchisor and is a resident of Arlington, Virginia.

10.    Defendant Szabari was an equity holder of VAP Sunshine prior to his resignation and surrender of those rights and is a resident of Miami, Florida.

11.    Defendant Beilenson is the former manager of the Doral Restaurant and is a resident of Miami-Dade County, Florida.

12.    Plaintiff does not currently know the names of DOES 1 through 20 and, therefore, sues said defendants by such fictitious names. Plaintiff alleges that each DOE defendant is in some way liable and at fault for the occurrences alleged herein, and each DOE defendant is responsible for the damages incurred by Plaintiff. Plaintiff will amend this Complaint to allege the DOE defendants' true names and capacities when ascertained.

13.    Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned in this Complaint, Defendants and each of the DOE defendants were the agents, servants, partners, affiliates, employees, co-conspirators, and/or joint-ventures of their co-defendants and in doing the things alleged in this Complaint, were acting pursuant to the conspiracy alleged herein.

## RELEVANT NON-PARTY INDIVIDUALS AND ENTITIES

14.     VAP Sunshine, LLC ("VAP Sunshine") is a Florida limited liability company that owns a 60% share in the Doral Restaurant and 100% ownership of the Reston Restaurant and Brickell Restaurant.

15.     William Shewalter, Senior Vice President, Development at The Related Group, along with attorney Alvin Lodish of Duane Morris, represented the landlord for the Doral Restaurant.

16.     Jessica Samo is a manager at Rockhill Management, and along with attorney Dany Clayton of Akerman, represented the landlord for the Brickell Restaurant.

17.     Jesse Dean-Kluger ("Kluger") is an attorney at Jesse Dean-Kluger, P.A. located in Miami, Florida. Kluger was retained by Maehle and Szabari to purportedly act on behalf of VAP Sunshine, LLC even though at the time he was retained, Maehle and Szabari no longer had authority to act on behalf of VAP Sunshine.

18.     VAP Invest LLC ("VAP Invest") is a Florida limited liability company owned by Thorsten Maehle. VAP Invest was voluntarily dissolved on August 11, 2017.

19.     VAPvest Corporation ("VAPvest") is a Florida corporation with a principal place of business in Miami, Florida. Its key officers are Alejandro Widmer (President), Katja Muriel Widmer (Vice-President), and Elisabeth Daniela Widmer (Secretary). Its registered agent is Albert Diaz-Silveira.

20.     Katja Muriel Widmer ("K. Widmer") is the daughter of J. Widmer, the sister of A. Widmer, and upon information and belief, is a resident of Miami-Dade County, Florida.

21.     Wedis Systemgastronomie GmbH (f/k/a Wedis Verwaltungs-GmbH ("Wedis GmbH") is a German company that previously held an equity interest in VAP Sunshine, LLC.

## **FACTUAL ALLEGATIONS**

*Plaintiff PSH Enters the Restaurant Sector*

22.    Plaintiff PSH is a holding company with interests across a wide array of industries. In 2018, PSH made the strategic decision to reduce its exposure in the residential real estate mortgage markets and to expand into retail consumer markets. As part of this strategy, PSH expanded into the film-financing industry and e-gaming markets. PSH also identified an opportunity to expand into the retail consumer markets through the acquisition of restaurant franchise rights in the United States.

23.    Specifically, PSH identified an opportunity to acquire rights to expand a successful European Italian-themed restaurant franchise in the U.S. market. This franchise had seen rapid expansion throughout Europe, but efforts to expand this franchise in the United States had not been successful. PSH believed that with the right backing this franchise could quickly blossom in the U.S. market. PSH identified two potential transactions to implement this strategy. The first transaction involved acquiring three existing franchised Restaurants from their majority owner, VAP Sunshine, thus providing PSH an existing U.S. footprint for the franchise. The second larger transaction involved acquiring U.S. development rights from the franchisor directly in order to expand the franchise throughout Florida, Illinois, and Virginia.

24.    PSH was unaware that development of the Doral Restaurant had been funded by an international money-laundering scheme, and that the illicit enterprise behind this money-laundering scheme was seeking to maintain control. It appeared that the initial funding tiers for development of the Restaurant had come from an individual named Thorsten Maehle through the entity he managed, VAP Invest. However, it later became clear that the true source of the funds was the nefarious J. Widmer. In order to disguise the origin of this money, the Widmer family created a disguised trust that was designed to

mask the funds unlawful origins. Maehle, as the frontman for this scheme, knew that the true source of the money was J. Widmer who had amassed his fortune through corrupt shipping transactions in Guatemala.

*The Widmer Enterprise Launders Illicit Bribery Proceeds*

25.     J. Widmer, known as "The King of the Ports" in Guatemala, is a key figure in an international bribery scandal. Specifically, in coordination with government officials, J. Widmer, through his various companies including but not limited to Novacom S.A., exchanged discounted tariff costs for bribes from importers. In April 2015, however, following a UN-assisted investigation, evidence of this network of corruption was disclosed by international prosecutors resulting in a scandal that reached the highest levels of the Guatemalan government. Although J. Widmer was suspected of being a major participant in this illicit bribery conspiracy, J. Widmer managed to escape Guatemala before he could be prosecuted, and moved to Switzerland where he remains a fugitive from justice according to Guatemalan media.[1] While Switzerland has extradition treaties, it has frequently taken a conservative approach to extradition requests and refuses to extradite its own nationals. Thus, Switzerland has unfortunately become somewhat of a known haven for some of the world's wealthiest financial criminals, as well as for other major international criminals who manage to obtain Swiss citizenship.[2]

---

[1] *See The reign of Jurg Widmer remains intact in the ports*, El Periodico, February 11, 2018, available at https://elperiodico.com.gt/investigacion/2018/02/11/el-reinado-de-jurg-widmer-sigue-intacto-en-los-puertos/

[2] *See 5 Countries With No U.S. Extradition Treaty*, Thomson Reuters (FindLaw), June 5, 2013, available at https://blogs.findlaw.com/blotter/2013/06/5-countries-with-no-us-extradition-treaty.html (referring to Switzerland as an "honorable mention" in a list of countries with no US extradition treaty because it has been "known to harbor U.S. fugitives"); Schectman, Joel, *Lawmakers Tell Justice Dept. to Seek Swiss Banker Extraditions*, Dow Jones & Company, March 18, 2014, available at

26.    Recognizing that he could not directly domesticate or invest the proceeds from his illicit activities in Guatemala, J. Widmer formed an enterprise (the "Widmer Enterprise") with several other individuals in order to launder his proceeds through various investments, including the Doral Restaurant. Specifically, J. Widmer formed an enterprise to launder his ill-gotten gains with his son, A. Widmer, his son's long-time best friend Maehle, and his attorney and confidant, Clemens Gregor. The Widmer Enterprise conspired to, and has taken numerous steps to, launder J. Widmer's unlawfully obtained wealth. Maehle agreed to be a frontman for the shell companies set up to invest the illicit Widmer cash thereby helping to mask its origins. J. Widmer's son, Alejandro, was also involved in the shell companies used to launder the money and to control the subsequent investments such as the one made in the Doral Restaurant. Clemens Gregor acted as European counsel for J. Widmer and the Widmer family, and has essentially become a consigliere to the Widmer Enterprise, advising it how to disguise the movement of its wealth using trusts and shell companies and assisting with the Widmer Enterprise's efforts to take control over otherwise lawful U.S. businesses such as the Doral Restaurant.

27.    J. Widmer and Maehle created a disguised trust in order to funnel the illicit proceeds into legitimate enterprises. The trust funded a shell company, VAP Invest, LLC ("VAP Invest"), with Maehle listed as the registered agent and manager. Although the structure of VAP Invest was intended to give the perception that Maehle was in control of the entity and the source of the funds, he was in fact merely a frontman for the Widmer Enterprise and was always

---

https://blogs.wsj.com/riskandcompliance/2014/03/18/lawmakers-tell-justice-dept-to-seek-swiss-banker-extraditions/ (discussing Senator McCain's request that the US Department of Justice pursue extradition of Swiss financial criminals, which it had not done based on the believe that Switzerland will refuse to extradite Swiss nationals regardless of the extradition treaty between the US and Switzerland).

1  knowingly acting on behalf of the Widmer family to assist their efforts to launder

2  J. Widmer's bribery proceeds.

3       28.    The purpose of VAP Invest was to hide the identity of the Widmer

4  family in connection with the investment of J. Widmer's unlawful bribery

5  proceeds into legitimate U.S. businesses. Once procured by the frontman, the

6  unlawful scheme involved transferring the investment to a different shell

7  company under the direct control of J. Widmer's children. Upon information and

8  belief, J. Widmer's children, A. Widmer and K. Widmer, set up many of these

9  shell companies to hold the investments made using their father's illicit bribery

10 proceeds. Indeed, A. Widmer and K. Widmer are listed as officers of no less than

11 five such Florida shell corporations including Widvest LLC, Tucan Enterprises,

12 Inc., Brickestate, Inc., Adventure Capital, Inc., and VAPvest (the entity that the

13 investment at issue here, the stake in the Doral Restaurant, was eventually

14 transferred to following acquisition).

15 *The Widmer Enterprise Infiltrates the Restaurants*

16      29.    In July 2016, VAP Invest made a $1 million investment in the Doral

17 Restaurant in exchange for a 40% interest in that business pursuant to a

18 Membership Interest Purchase Agreement with VAP Sunshine executed by

19 Thorsten Maehle as the manager of VAP Invest. (*See* Membership Interest

20 Purchase Agreement attached hereto as Exhibit A). Unbeknownst to anyone but

21 the members of the Widmer Enterprise, the true source of this investment was the

22 bribery proceeds of J. Widmer. Subsequently, VAP Invest, through the Widmer

23 Enterprise's frontman, Maehle, transferred the 40% interest in the Doral

24 Restaurant to VAPvest Corp, an entity that was also controlled by the Widmer

25 Enterprise. At all times, Maehle understood that his role was to act on behalf of

26 the Widmer Enterprise and to use this complicated investment mechanism to

27 conceal the true origin of the investment funds.

28

30.     Following the initial $1 million investment of J. Widmer's bribery proceeds into VAP Sunshine as described above, an additional $1 million loan was made in 2016 by VAP Invest to Wedis GmbH, which at the time was the 97.5% owner of VAP Sunshine, LLC. The loan was secured by a guarantee from VAP Sunshine and was also paid as a priority payment on time every month through December 2017, even though VAP Sunshine was never, during this time period, even paid its management fee. However, the guarantee from VAP Sunshine, that was negotiated and agreed upon by Maehle acting at the direction of the Widmer Enterprise, was provided without any consideration for VAP Sunshine whatsoever. Thus, when Wedis GmbH subsequently declared bankruptcy in 2018, VAP Sunshine remained obligated to make the loan payments – payments that were being provided to the Widmer Enterprise through their frontman Maehle – even though VAP Sunshine never received any benefit or consideration whatsoever for guaranteeing this loan.

31.     In March 2017, VAPvest, which was directly controlled by J. Widmer's children, provided an additional $200k loan structured as a convertible note in order to finish construction of the Doral Restaurant. Once again, the source of this investment was the illicit bribery proceeds of J. Widmer. This note was structured so that it could be converted into an additional 15% interest in the Doral Restaurant. If converted, this note would provide VAPvest with a total 55% interest in the Doral Restaurant when combined with the prior 40% interest that had been transferred to VAPvest from VAP Invest following the 2016 investment. Although representatives of the Doral Restaurant attempted to repay the loan prior to its conversion by delivering a certified check to VAPvest, Gregor refused to accept repayment in a clear attempt to take control of the Doral Restaurant.

32.     In February 2018, Wedis GmbH, the majority owner of VAP Sunshine, filed for bankruptcy. Shortly thereafter, J. Widmer, through his

representative Gregor, contacted the franchisor about obtaining a franchise license to operate the Doral Restaurant. This request was unambiguously and categorically denied. Following the franchisor's denial of a franchise license, VAPvest and its controlling Widmer Enterprise members, refused to provide any further operating capital. As a result, the Doral Restaurant fell behind on rent as well as its franchise fees and began to face significant financial troubles.

33.     These investments by the Widmer Enterprise through the shell companies of VAP Invest, LLC and VAPvest Corp. were part of a coordinated and disguised effort to launder J. Widmer's unlawful bribery proceeds and designed to provide the Widmer Enterprise with a mechanism for taking control of the Doral Restaurant regardless of the franchisor's knowledge or approval. While the Widmer Enterprise has not yet been able to circumvent the franchisor's refusal to grant anyone associated with the Widmer Enterprise a franchise license, their effort to do so is continuing through the filing of this action.

34.     While the franchisor has refused to grant anyone associated with the Widmer family a franchise license, the Widmer's have continued to exercise domination over the Doral Restaurant nonetheless, and have taken steps to infiltrate the daily operations in order to facilitate their money-laundering machine. Among other things, the Widmer Enterprise has expanded its influence over the Restaurants in an effort to exercise domination over them by recruiting individuals within the franchisor's U.S. division and placing or recruiting their agents within the restaurants themselves as managers. The in-restaurant representatives of the Widmer Enterprise, including Defendants Szabari and Beilenson, were critical as they would allow the Widmer Enterprise the ability to launder cash more easily.

35.     Not only was the Widmer Enterprise laundering J. Widmer's ill-gotten bribery proceeds by investing in the Doral Restaurant through various shell companies, but eventually, the Widmer Enterprise appeared intent on

1    exercising domination over the Doral Restaurant so they could control day-to-
2    day operations with the ultimate goal of using the enterprise for money
3    laundering.

4        36.    This illicit scheme may have gone unnoticed and unhindered for
5    years except for the decision by one of its members, Defendant Maehle, to cash-
6    out of the Widmer Enterprise through a sale of his interest in the Restaurants.
7    Upon information and belief, Defendant Maehle had knowingly participated in
8    the Widmer Enterprise, but following a dispute with the Widmer family, had
9    decided to liquidate his interest in the Restaurants, including the Doral
10   Restaurant. Thus, when the managing partner of Sunshine, Andres Moser,
11   approached PSH about selling the Restaurants in December 2018, Defendant
12   Maehle jumped at the opportunity to cash-out and walk away from the Widmer
13   Enterprise's illicit scheme.

14   *PSH Walks into the Hornets' Nest*

15       37.    Unaware of the hornets' nest it was walking into and the nefarious
16   origin of the funds used to develop the Doral Restaurant, PSH entered
17   discussions with Andreas Moser and Thorsten Maehle to acquire their 97.5%
18   interest in VAP Sunshine. VAP Sunshine had a 100% interest in the Brickell and
19   Reston Restaurants, and a 60% interest in the Doral Restaurant. The parties to the
20   Sunshine Transaction set forth the terms of this agreement in a Non-Binding
21   Proposal to Purchase the Equity Interests of VAP Sunshine, LLC. (*See* Sunshine
22   Transaction Closing Letter and exhibits thereto attached hereto as Exhibit B.) On
23   January 8, 2019, the parties to the Sunshine Letter entered into a Consent of
24   Members as contemplated thereby mutually agreeing to make the Sunshine
25   Acquisition Agreement binding and enforceable. (*See id.*)

26       38.    Unfortunately, the remaining members of the Widmer Enterprise, J.
27   Widmer, A. Widmer, and Gregor, were not willing to let such an ideal
28   money-laundering scheme go without a fight. While the Widmer Enterprise

1    could not legally prevent its former member, Defendant Maehle, from selling his

2    shares in VAP Sunshine to PSH, they remained intent on benefiting from or

3    blocking the Sunshine Transaction.

4        39.    Initially, the Widmer Enterprise tried to work directly with or

5    "recruit" PSH in hopes that they may be able to replace Maehle with a new

6    frontman that not only had franchise approval to operate the existing Restaurants,

7    but also had the right to develop even more franchised restaurants that they could

8    infiltrate for their money-laundering operations. As such, J. Widmer and Gregor

9    met with representatives of PSH in Switzerland to discuss how they could remain

10   involved with the VAP Sunshine Restaurants, and potentially invest in PSH's

11   U.S. Transaction aimed at expanding the franchise.

12       40.    Not knowing the full background of the Widmer family and the

13   origin of J. Widmer's wealth, PSH approached the franchisor about the

14   possibility of partnering with the Widmer family. The franchisor, however,

15   immediately and unambiguously rejected all suggestions involving the Widmer

16   family in the U.S. Transaction or any proposal that would result in the Widmer

17   family having any control over franchised restaurants.

18       41.    Upon learning of the Widmer family's background and the origin of

19   J. Widmer's wealth, PSH also came to the independent conclusion that it could

20   not do business with the Widmer family in any capacity. Moreover, PSH's

21   subsequent diligence also uncovered troubling information about Thorsten

22   Maehle. First, PSH came to learn that Maehle was A. Widmer's close friend and

23   confidant. Second, and more importantly, PSH's investigation revealed evidence

24   that the funds Maehle had purportedly invested in VAP Sunshine through the

25   various shell companies had not in fact come from Maehle, but instead had come

26   from the Widmer family and represented J. Widmer's illicit bribery proceeds.

27   Thus, PSH's preliminary investigation suggested that Maehle was merely a

28   frontman operating on behalf of the Widmer family to assist them in laundering

1    J. Widmer's ill-gotten wealth. Accordingly, PSH determined that it could not

2    send the requisite payments to Defendant Maehle pursuant to the Sunshine

3    Agreement until after it was able to fully investigate the relationship between

4    Maehle and the Widmer family, and identify the source of the funds that Maehle

5    used to invest in the Doral Restaurant through VAP Invest and VAPvest, and

6    stopped all payments en route to Defendant Maehle. It is important to note that at

7    this point, PSH did send the required payments to the other sellers and creditors

8    of Sunshine, distinguishing between those that PSH thought were merely

9    innocent parties caught in the middle of Widmer's scheme from Widmer

10   Enterprise's frontman, Thorsten Maehle.

11         42.    After learning that PSH would not make the required payment to

12   him until the specific nature of his connection to the Widmer Enterprise could be

13   determined, Maehle again began to take actions in furtherance of the Widmer

14   Enterprise, and to cooperate with the Widmer family. Moreover, Maehle, who

15   had direct contact with many key Restaurant employees and local U.S. franchisor

16   representatives, began to recruit other third parties to assist the Widmer

17   Enterprise, including but not limited to Defendants Carlos Politano, Endre

18   Szabari, and Michael Beilenson.

19   *The Widmer Enterprise's Assault on PSH*

20         43.    Upon learning that PSH could not or would not partner with the

21   Widmer family in connection with its ownership and development of the

22   franchised restaurants, and PSH's pause to reflect how to handle Maehle, the

23   Widmer Enterprise engaged in a concerted effort to block, attack, and interfere

24   with PSH's lawful acquisition and operation of the Restaurants and to tortiously

25   interfere with PSH's U.S. Transaction to further develop the franchise. The

26   Widmer Enterprise attempted to achieve this goal employing three general

27   methods: (a) an abusive and harassing legal attack intended to distract,

28   embarrass, and drain the resources of PSH; (b) an assault on PSH's operation of

the Restaurants intended to reduce the Restaurants' revenue, increase costs, harm PSH's reputation in the industry, and interfere with PSH's relationship with the franchisor; and (c) a defamation campaign designed to interfere with PSH's relationship with the franchisor. Specific examples of the Widmer's assault on PSH include, but are not limited to:

a. Members of the Widmer Enterprise, either directly or through third parties, engaged and continue to participate in a smear campaign designed to encourage Restaurant employees to quit, refuse to cooperate with PSH, and/or cooperate directly with the Widmer Enterprise and its agents and representatives. The Widmer Enterprise and other Defendants, including Defendant Politano, have repeatedly and systematically texted, called, and emailed Restaurant employees defamatory statements about PSH.

b. Widmer Enterprise members including A. Widmer, Thorsten Maehle, and Clemens Gregor repeatedly threatened or intimidated Restaurant employees through phone calls and in person. The threats and intimidation were so aggressive and unfortunately effective in interfering with PSH's ability to work with Restaurant staff, that PSH was forced to send a letter to Gregor through counsel demanding that he and his co-conspirators cease and desist further communications with Restaurant employees.

c. Upon information and belief, the Widmer Enterprise or its representatives also handed out cash to employees and encouraged them to strike against new ownership and/or refuse to work for PSH. Representatives of the Widmer Enterprise then contacted local news media sources in order to attract unfavorable attention that caused significant reputational harm to PSH and the Restaurants.

1         d.     Similarly, upon information and belief, the Restaurants' credit

2    card payment processing vendor repeatedly represented to Defendant

3    Politano that the accounts should be set up with new Employer

4    Identification Numbers ("EIN") to avoid any interruption in the transfer of

5    credit card payment funds to the Restaurants' accounts. In other words, the

6    Restaurants' accounts had to be changed to ensure that new ownership,

7    PSH, could control the accounts. As the vendor advised Politano, if the

8    EINs were not changed, Plaintiff would not be able to exercise control

9    over those accounts or coordinate transfer of the credit card payments to

10   new accounts, thus causing further confusion and interfering with PSH's

11   ability to exercise control over the Restaurants' primary source of revenue.

12   Notwithstanding, Politano failed to take this step or advise Plaintiff of this

13   issue, thus interfering with Plaintiff's ability to work with the vendor to

14   ensure uninterrupted credit card payment deposits for the Restaurants.

15   Ultimately, exactly what the vendor warned Politano would happen if the

16   EINs weren't changed, did.

17        e.     In an effort to interfere with PSH's good faith efforts to

18   operate the Restaurants in the existing leased spaces, representatives of the

19   Widmer Enterprise, believed to be A. Widmer, Gregor, and Maehle,

20   contacted the landlords for the Doral and Brickell Restaurants (Shewalter

21   and Samo) and interfered with ongoing negotiations regarding the transfer

22   of the existing leases to PSH, and with PSH's negotiations regarding

23   payment of amounts due under the lease.

24        f.     The Widmer Enterprise also interfered with Plaintiff's

25   operation of the Restaurants by interfering with their banking abilities. On

26   or about March 22, 2019, through their co-conspirator, Szabari, the

27   Widmer Enterprise locked the BB&T bank accounts associated with the

28   Restaurants instead of transferring them to the new ownership. These

accounts were connected to all vendor auto-debit and ACH payments and were property of the Restaurants now owned by Plaintiff. This interfered with Plaintiff's ability to manage and operate the Restaurants until they were able to coordinate with BB&T to take control of the accounts.

g.      On March 28, 2019, the Widmer Enterprise unlawfully took over physical operations at the Doral Restaurant for one day during which they collected all the Restaurant's receivables. The Widmer Enterprise accomplished this by fraudulently informing Shewalter (the Doral Restaurant's landlord) that VAPvest and the Widmer family were the true owner of the Restaurant and thus obtaining his assistance in placing the Widmer Enterprise's chosen manager, Defendant Beilenson, in charge of the Restaurant. For his part in this scheme, Defendant Beilenson (whom Shewalter referred to in email as "Clemens [Gregor]'s guy") was paid in cash directly or indirectly by the Widmer Enterprise. After physically taking over the Doral Restaurant, Beilenson installed a "Square" credit-card reader to divert all the Doral Restaurant's revenue to the Widmer Enterprise. In this manner the Widmer Enterprise, through Defendant Beilenson, was able to convert revenue due to the Doral Restaurant and its true owner, PSH, and take it for themselves. Plaintiff PSH was eventually able to resolve this situation and take back control over the Doral Restaurant by having the franchisor provide Shewalter with a letter demonstrating PSH was the lawful franchisee. However, PSH was not able to regain control until after it had already lost nearly a full day of revenue and not without incurring substantial reputational harm with the Doral Restaurant staff and employees as well as the franchisor.

h.      Maehle, with assistance from A. Widmer, recruited Szabari to assist in preventing PSH from its lawful operation of the Restaurants by refusing to perform his actions as managing member of VAP Sunshine.

Although Szabari resigned from the Restaurants and VAP Sunshine on or about March 10, 2019, and thus, pursuant to the operating agreement, relinquished his shares in VAP Sunshine, he nonetheless continued to unlawfully hold himself out to third parties as a legal representative of VAP Sunshine in furtherance of the goals of the Widmer Enterprise.

i.     Maehle (who re-aligned with and/or rejoined the Widmer Enterprise following PSH's refusal to pay him until after it resolves the issues raised by the Widmer Enterprise's actions) and A. Widmer, along with their more recent conspiratorial recruit, Szabari, have also retained counsel, in some cases under false premises, to file numerous harassing and unfounded lawsuits against PSH in a transparent attempt to use the judicial process to interfere with PSH's lawful ownership and control of the Restaurants.

j.     The first of these lawsuits was filed on behalf of VAPvest Corp. (an entity that is fully controlled and operated by the Widmer family) on or about March 1, 2019. (*See* Complaint attached hereto as Exhibit C.) PSH attempted to resolve this initial suit amicably through settlement. During the settlement discussions, the parties discussed several options including (i) VAPvest buying out PSH and taking the Restaurants either with or without a franchise license or (ii) PSH buying out VAPvest by paying $1.6 million to compensate for the alleged development investment by the Widmer family. Although PSH believed this figure was unreasonably high because, among other things, it included compensation for the Wedis GmbH loan that VAP Sunshine had guaranteed despite the lack of consideration to VAP Sunshine, PSH nonetheless verbally agreed to accept this figure and buy-out VAPvest in the interest of avoiding further harm to the Restaurants. Surprisingly, the Widmer controlled VAPvest, through its counsel, broke off further settlement discussions and

continued to prosecute its action through counsel. This startling course of conduct demonstrates that the real intent of this lawsuit was and is an attempt to extort through other means the franchise license that the Widmer family had thus far been unable to obtain. The Widmer family demonstrated through statements by counsel that it believed PSH could facilitate issuance of a franchise license. PSH repeatedly noted that the franchisor had unambiguously rejected giving anyone associated with the Widmer family a franchise license, and thus, they simply could not deliver on such a request. But VAPvest's counsel refused to accept this fact. Accordingly, VAPvest has continued to prosecute its action, despite having been offered the full amount of its stated financial demand, in a clear attempt to continue its effort to extort a franchise license.

k.     Thereafter, on or about April 26, 2019, Defendants Maehle and Szabari retained attorney Jesse Dean-Kluger to file "civil theft" claims against PSH (attached hereto as Exhibits D and E), PSH's CEO (Matthew Browndorf), and PSH's law firm. These actions were purportedly brought on behalf of VAP Sunshine despite the fact that neither Maehle or Szabari were legal representatives of VAP Sunshine at the time they retained attorney Kluger or the suits were filed. Indeed, prior to engaging attorney Kluger, Maehle had already sold his shares in VAP Sunshine and Szabari had already relinquished his shares. Moreover, both Maehle and Szabari were well aware that PSH was in fact the true and lawful owner of VAP Sunshine. Accordingly, Maehle and Szabari retained attorney Kluger under false premises to sue PSH ostensibly on behalf of VAP Sunshine, despite knowing that PSH in fact owned VAP Sunshine. PSH has already demonstrated to attorney Kluger that they are the lawful of VAP Sunshine but surprisingly Kluger has yet to withdraw the Complaints.

l.      The Widmer Enterprise has also infiltrated the franchisor and encouraged its own agents or employees to try to block the transaction with the promise of pecuniary reward. Specifically, upon information and belief, A. Widmer, Maehle, and Gregor have made financial promises to Defendant Politano, the CEO of the franchisor's U.S. division, in exchange for his effort to block the PSH acquisition of the larger franchise development rights. As a result, Defendant Politano has, instead of acting to assist with the operation of the Restaurants as required by his job, has done everything he can to interfere with PSH's efforts to operate the Restaurants and close on the U.S. Transaction. This is not surprising given that Politano explicitly admitted in an email dated March 8, 2019 that he intended to "do everything [he could] to stop the deal between [PSH] & [the franchisor]...." Politano has also encouraged Restaurant staff to quit or refuse to work, interfered with Restaurant vendors, and made or repeated disparaging and defamatory comments about PSH to Restaurant staff.

*PSH Suffers Substantial Losses Due to the Widmer Enterprise's Assault*

44.     The above conduct has caused PSH substantial and ongoing harm.

45.     First, by interfering with the operation of the Restaurants, the Widmer Enterprise has deprived PSH of the ordinary revenue generated by these Restaurants causing it to default on several acquisition lines of credit it had obtained, and also causing it to lose revenue necessary to pay vendors and employees of the companies. Indeed, as of the date of this filing, the Widmer Enterprise's direct and indirect actions have caused several of the Restaurants to close at least temporarily and possible even permanently. Some of the Defendants have in fact even celebrated the results of their inappropriate and unlawful conspiracy to harm PSH with specific social media posts. For example, in May 2019, Defendant Beilenson (the former Doral Restaurant manager that had unlawfully taken over the Doral Restaurant at the direction of the Widmer

Enterprise) posted a photo on Facebook showing him and several other individuals having a dinner with the caption (translated from Spanish to English) "Celebrating the closure of [the Restaurants]" following the at least temporary closure of the Doral and Brickell Restaurants due to the efforts of the Widmer Enterprise and their co-conspirators.

46.     Second, the Widmer Enterprise forced PSH to incur substantial and unnecessary costs in defending against its attacks including but not limited to (i) incurring substantial legal costs to deal with the numerous attacks on PSH by the Widmer Enterprise and its co-conspirators; (ii) re-directing substantial internal resources to address the issues caused by the Widmer Enterprise's attacks; (iii) sending PSH representatives to the specific locations for substantial periods of time in order to be onsite to defend against the Widmer Enterprise's attacks; and (iv) forcing PSH to deliver substantial bonuses and additional payments to Restaurant staff in order to convince them to stay and continue operations despite the difficult work environment.

47.     Third, the Widmer Enterprise's efforts to block the larger U.S. Transaction has not been without a cost, as it has harmed the relationship between PSH and the franchisor and forced PSH to incur substantial additional expenses protecting that transaction.

48.     Finally, the Widmer Enterprise's actions have in fact deteriorated the very value of the larger U.S. Transaction. The value of the larger U.S. Transaction to third party investors is determined in part by the revenue generated by the existing Restaurants. By interfering with the ordinary operation of these existing Restaurants and thereby reducing the revenue generated by these Restaurants, the Widmer Enterprise has likely increased the cost of capital necessary to develop the additional franchised restaurants contemplated under the U.S. Transaction. Moreover, the Widmer Enterprise has potentially caused at least temporary brand damage by interfering with the Restaurants' normal

operations. This may only be fleeting in nature, but it still has an economic impact.

### FIRST CAUSE OF ACTION

### AGAINST J. WIDMER, A. WIDMER, MAEHLE, AND GREGOR

### (Federal Civil RICO, 18 U.S.C. § 1962(c))

49.    Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth herein.

50.    Defendants J. Widmer, A. Widmer, Maehle, and Gregor (the "RICO Defendants") violated RICO and Plaintiff was injured as a result.

51.    Plaintiff is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

52.    Each of the RICO Defendants is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

53.    Each of the RICO Defendants violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further detailed below.

54.    The Enterprise. Defendants J. Widmer, A. Widmer, Maehle, and Gregor together with the entities they control, including but not limited to VAP Invest and VAPvest, form an association-in-fact for the common and continuing purpose described herein, and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4), which is engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the Widmer Enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

55.    Pattern of Racketeering Activity. The RICO Defendants, each of whom are persons associated with, or employed by, the Widmer Enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the Widmer Enterprise though a pattern of racketeering activity

1   within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The
2   racketeering activity was made possible by the RICO Defendants' regular and
3   repeated use of the facilities and service of the Widmer Enterprise, and the
4   various shell companies set up by the RICO Defendants, including but not
5   limited to VAPvest. The RICO Defendants had the specific intent to engage in
6   the substantive RICO violations alleged herein.

7       56.   Predicate acts of racketeering activity are acts which are indictable
8   under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as
9   more specifically alleged below. Defendants each committed at least two such
10  acts or else aided and abetted such acts.

11      57.   The acts of racketeering were not isolated, but rather the acts of the
12  RICO Defendants were related in that they had the same or similar purpose and
13  result, participants, victims, and methods of commission. Further the acts of
14  racketeering by the RICO Defendants have been continuous. There was repeated
15  conduct during a period beginning in early 2016 and continuing through to the
16  present, and there is a continued threat of repetition of such conduct.

17      58.   The association-in-fact Widmer Enterprise, as alleged herein, was
18  not limited to the predicate acts, and extended beyond the racketeering activity.
19  Rather, it existed separate and apart from the pattern of racketeering activity for
20  the purpose of laundering J. Widmer's illicit bribery funds through the
21  investment in and continued operation of otherwise legitimate U.S. businesses
22  including but not limited to the Doral Restaurant. The RICO Defendants have
23  had and do have, upon information and belief, legitimate plans outside of the
24  racketeering activity including, once all of J. Widmer's unlawful funds are
25  laundered through the investment in and operation of otherwise legitimate U.S.
26  business, continuing to operate some or all of the legitimate U.S. businesses they
27  have acquired through the laundering of these illicit funds.

28

59.     Plaintiff PSH specifically alleges that the RICO Defendants have participated in the operation and management of the association-in-fact Widmer Enterprise by overseeing and coordinating the commission of multiple acts of racketeering as described below.

60.     <u>Predicate Acts: Money Laundering.</u> The RICO Defendants committed no less than three offenses under 18 U.S.C. § 1956 by knowingly conducting financial transactions with property that was proceeds of unlawful activity at least three times with respect to the Widmer Enterprise's investment in the Doral Restaurant.

61.     The money that was invested in the Doral Restaurant by the Widmer Enterprise through VAP Invest and its frontman and co-conspirator, originated from unlawful activity pursuant to 18 U.S.C. § 1956 because it constituted the proceeds of J. Widmer's bribery network which involved bribery of a public official and/or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official.

62.     The Widmer Enterprise engaged in three specific related but separate financial transactions that constituted violations of 18 U.S.C. § 1956 and thus constituted three distinct but related predicate acts in furtherance of the common purpose of their RICO enterprise. As discussed above, the following three financial transactions constitute examples of the Widmer Enterprise's knowing participation in financial transactions that involved the use of the proceeds of known unlawful activity: investment of (i) $1 million of J. Widmer's unlawful bribery proceeds in the Doral Restaurant on or about July 2016 in exchange for a purported 40% interest in the Doral Restaurant; (ii) $1 million of J. Widmer's unlawful bribery proceeds in Wedis GmbH in exchange for a guarantee from VAP Sunshine without any consideration provided to VAP Sunshine in late (after July) 2016; and (iii) $200,000 of J. Widmer's unlawful

bribery proceeds in the Doral Restaurant in the form of a convertible note on or about March 2017.

63.   These acts were done intentionally and knowingly with the specific intent to advance the Widmer Enterprise's illicit scheme.

64.   The RICO Defendants' shared objective was and is to launder the proceeds of J. Widmer's unlawful activity.

65.   Plaintiff PSH has been damaged as a direct and proximate result of the RICO Defendants' investment in the Doral Restaurant, and the Widmer Enterprise's unlawful attempt to maintain control of the Doral Restaurant following its acquisition by PSH as part of the Sunshine Transaction.

66.   <u>Predicate Acts: Mail and Wire Fraud.</u> Defendants Maehle and Gregor in furtherance of the Widmer Enterprise committed acts constituting offenses under 18 U.S.C. §§ 1341 and 1343. For the purpose of preventing PSH's lawful operation and exercise of control over the Doral Restaurant, Defendants Maehle and Gregor caused delivery of documents and things by U.S. mail or by private or commercial interstate carriers and transmitted or caused to be transmitted by means of wire communications interstate or foreign commerce various writings, signs, and signals. The acts of Defendants Maehle and Gregor set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance the Widmer Enterprise's scheme or artifice.

67.   Specifically, Maehle along with or through Szabari, fraudulently represented to attorney Jesse Dean-Kluger that he and Szabari were proper and lawful representatives of VAP Sunshine in or around March 2019 for the purpose of inducing attorney Kluger to file several frivolous and harassing lawsuits. The purpose of these lawsuits was to improperly use the U.S. judicial system as a

means of furthering the interests and purpose of the Widmer Enterprise by trying to regain or maintain control over the Doral Restaurant on behalf of the Widmer Enterprise. Defendant Maehle knew at the time of these statements to attorney Kluger that he was no longer a representative or owner of VAP Sunshine, and thus could not initiate suit on behalf of VAP Sunshine, as he had sold his shares of that entity to Plaintiff PSH. Likewise, Defendant Maehle knew at the time of these statements to attorney Kluger that Defendant Szabari was no longer a representative or owner of VAP Sunshine following Szabari's resignation and associated relinquishment of his shares and thus that Defendant Szabari could not initiate suit on behalf of VAP Sunshine.

68.     Defendant Maehle along with or through Defendant Szabari used interstate wire and/or U.S. mail or private commercial carriers to make these fraudulent representations to attorney Kluger.

69.     RICO Defendant Gregor also made fraudulent representations regarding the ownership of VAP Sunshine and the Doral Restaurant in furtherance of the Widmer Enterprise's effort to improperly regain or maintain control of the Doral Restaurant. Specifically, in March of 2019, Gregor represented that the Widmer family was the legal owner of VAP Sunshine to William Shewalter and/or his agents as the landlord for the Doral Restaurant. Defendant Gregor made these representations in order to convince Shewalter to assist in providing Gregor's "guy," Defendant Beilenson, with management control over the Doral Restaurant. Representatives of the Widmer Enterprise directly or indirectly provided Defendant Beilenson with cash to convince him to take over the Doral Restaurant and to install "Square" credit-card readers to divert restaurant revenue into accounts controlled by the Widmer Enterprise. Based on Defendant Gregor's fraudulent representations to Shewalter, Defendant Beilenson was able to accomplish this goal for at least one business day before

Plaintiff was able to prove to Shewalter that they were the lawful owner and operator of the Doral Restaurant.

70.    Defendant Gregor used international or interstate wire communication and/or U.S. mail or private or commercial mail carriers to make these knowingly fraudulent representations to Shewalter with the intent of deceiving Shewalter and harming Plaintiff PSH. Defendant Gregor's intent was to further the purpose and goals of the Widmer Enterprise.

71.    <u>Continuity of Conduct.</u> The RICO Defendants' violations of state and federal laws as set forth herein, each of which directly and proximately injured Plaintiff PSH, constituted a continuous course of conduct spanning a period from approximately 2015 to the present, which was intended to launder the illicit gains of J. Widmer through a sophisticated money-laundering scheme. Therefore, said violations were part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

72.    The unlawful actions of the RICO Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff PSH in its business. Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars in damages the RICO Defendants have caused to the existing Restaurants that PSH owns, and to the reputational harm to the restaurants PSH has negotiated for the right to build pursuant to the larger U.S. Transaction.

73.    Plaintiff PSH accordingly seeks an award of three times the damages it has sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

**SECOND CAUSE OF ACTION**

**AGAINST J. WIDMER, A. WIDMER, MAEHLE, AND GREGOR**

**(Conspiracy to violate Federal Civil RICO, 18 U.S.C. § 1962(c))**

74.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth herein.

75.     In violation of 18 U.S.C. § 1962(d), the RICO Defendants each knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation of the Widmer Enterprise through a pattern of racketeering activity as described above.

76.     The conspiracy commenced as early as 2015 after J. Widmer was forced to flee Guatemala to avoid prosecution for his role in a bribery network.

77.     The conspiracy's purpose was to launder the money that J. Widmer had unlawfully obtained pursuant to his participation in a Guatemalan customs bribery network.

78.     Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included, setting up a blind family trust to conceal the origin of the money contributed by J. Widmer, setting up and utilizing shell companies and Maehle as a front-man to invest the illicit money into legitimate U.S. businesses, including the Doral Restaurant, and engaging or recruiting others to engage in the extensive tortious conduct described in this Complaint in order to try to gain control over the Doral Restaurant so that it could be used for further money-laundering activity.

79.     Even if some of the RICO Defendants did not specifically agree to harm Plaintiff PSH, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was a reasonably foreseeable consequence of the RICO Defendants' actions.

80.     Plaintiff has been injured and continues to be injured in its business and property by the RICO Defendants' conspiracy in violation of 18 U.S.C.

§ 1962(d). The unlawful actions of the RICO Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff PSH in its business and property. Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars in damages that the RICO Defendants have caused to the existing Restaurants that PSH owns and to the reputational harm to the restaurants PSH has negotiated for the right to build pursuant to the larger U.S. Transaction.

81.     Plaintiff PSH accordingly seeks an award of three times the damages it has sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

### THIRD CAUSE OF ACTION

### AGAINST GREGOR, MAEHLE, J. WIDMER, AND A. WIDMER

### (Civil Extortion)

82.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth herein.

83.     Defendants J. Widmer, A. Widmer, Gregor, and Maehle through VAPvest and its counsel demanded that Plaintiff obtain a franchise license for a member of the Widmer family or they would continue to wrongfully harass Plaintiff PSH through the legal process. The Defendants made such a demand despite Plaintiff PSH's offer to pay the full and unwarranted financial amount that VAPvest through its counsel has demanded. PSH only verbally accepted this figure in order to avoid further harm to the Restaurants and franchise brand but the RICO Defendants though VAPvest and its counsel refused to stop prosecution of the matter unless Plaintiff got a franchise license for the Widmer family.

84.     PSH agreed to approach the franchisor about a franchise license for the Widmer family despite the franchisor's prior refusal to grant such a license.

85.     The Defendants knew that their action to take control over VAP Sunshine and the Doral Restaurant was unfounded because PSH had acquired

1    ownership of both entities but continued to prosecute the action unless PSH got it

2    a franchise license.

3         86.    The franchisor was unwilling to provide the Widmer family with a

4    franchise license. The RICO Defendants learned of this and stopped prosecuting

5    their action but only after Plaintiff PSH expended substantial amounts on legal

6    defense costs and only after the RICO Defendants' improper lawsuit caused

7    substantial reputational harm to the Restaurants and to Plaintiff PSH.

8                        **<u>FOURTH CAUSE OF ACTION</u>**

9              **AGAINST GREGOR, A. WIDMER, AND BEILENSON**

10                          **(Conversion)**

11        87.    Plaintiff incorporates by reference all the preceding paragraphs of

12   this Complaint as though fully set forth herein.

13        88.    Plaintiff PSH validly owned VAP Sunshine and the Doral Restaurant

14   and as the legal owner was entitled to all the revenue generated by the Doral

15   Restaurant.

16        89.    Defendants Gregor, A. Widmer, and Beilenson converted revenue

17   due Plaintiff by physically and unlawfully taking over the Doral Restaurant on

18   March 28, 2019 and diverting credit card revenue due to Plaintiff to themselves

19   and the Widmer Enterprise via use of a Square credit card reader.

20        90.    Defendants A. Widmer and Gregor directly or indirectly paid cash to

21   Defendant Beilenson to take over the Doral Restaurant in coordination with

22   fraudulent statements to the landlord's representative, William Shewalter.

23        91.    Defendant Beilenson knew or should have known that A. Widmer

24   and Gregor were not the true owner of the Restaurants but in return for cash

25   compensation physically took over the Doral Restaurant under the control and

26   with their assistance and diverted credit card revenue due to Plaintiff to the

27   Widmer Enterprise.

28

92.     Plaintiff PSH was damaged as a result of the above conduct in that it lost revenue it was entitled to receive at the Doral Restaurant and, moreover, was damaged in reputation as a result of the temporary takeover off the Doral Restaurant by Defendants A. Widmer, Gregor, and Beilenson.

### FIFTH CAUSE OF ACTION

### AGAINST POLITANO

### (Tortious Interference with Contract)

93.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as though fully set forth herein.

94.     The pending U.S. Transaction executed by Plaintiff PSH and the franchisor provides Plaintiff with development rights to further expand the franchise in Florida, Illinois, New York, New Jersey, Virginia, and Washington, DC and acquire several additional existing franchised restaurants. The Sunshine Transaction provided Plaintiff with ownership and control over three existing Restaurants.

95.     Defendant Politano was fully and completely aware of the relationship between Plaintiff PSH and the franchisor, the U.S. Transaction, and the Sunshine Transaction.

96.     Defendant Politano has unambiguously and explicitly stated his intent to disrupt the relationship between the franchisor and Plaintiff PSH by destroying the U.S. Transaction and the Sunshine Transaction. Indeed, in an email dated March 8, 2019, Defendant Politano specifically stated that he would "do everything to stop the deal between [Plaintiff PSH and the franchisor]."

97.     Defendant Politano has conspired with the Widmer Enterprises and/or the other Defendants named herein to disrupt Plaintiff PSH's lawful operation of the Restaurants by, among other things:

a.  Making incorrect and unflattering statements about PSH to the franchisor, Restaurant employees, Restaurant vendors, and other third parties.

b.  Refusing to cooperate with PSH's operational needs despite the fact that he is the CEO of the U.S. arm of the European franchisor. For example, Defendant Politano removed one of his employees, Simon Wu, from the Reston Restaurant despite the fact that Mr. Wu was filling a management void at that location, and with full knowledge that Mr. Wu's removal without notice would leave a management vacuum at the Reston Restaurant that would be difficult to fill without substantial harm to PSH and the Reston Restaurant.

c.  Encouraging Restaurant employees to quit, strike, or otherwise refuse to cooperate with PSH as the new owner and manager of the Restaurants, despite his obligation to support and assist PSH with the operation of the Restaurants as the CEO of the U.S. division of the franchisor.

98.    Defendant Politano's conduct has disturbed the relationship between the franchisor and Plaintiff PSH, has caused delays, jeopardized the U.S. Transaction, and has led to significant problems at the three existing Restaurants.

99.    Defendant Politano's conduct has caused substantial damage to PSH. Defendant Politano has caused significant reputational harm and loss of revenue at the Restaurants currently owned and operated by PSH. This reputational harm and reduced revenue have also caused a substantial reduction in the value of the U.S. transaction to PSH because the cost of capital to be raised for the U.S. Transaction is tied to the revenue coming into the existing Restaurants, as those figures factor into the revenue projections for the restaurants to be developed. The chaos that has been caused by Defendant

1  Politano's conduct has also resulted in substantial delays in closing the U.S.

2  Transaction, which has caused PSH to incur considerable delay damages. Finally,

3  while Defendant Politano has not yet succeeded in his stated intent to "stop the

4  deal" between the franchisor and Plaintiff PSH, the U.S. Transaction, which is

5  worth several hundred million dollars, is now at substantial risk as a direct and

6  proximate result of Defendant Politano's conduct and cooperation of the Widmer

7  Enterprise.

8                        **SIXTH CAUSE OF ACTION**

9                       **AGAINST ALL DEFENDANTS**

10                           **(Civil Conspiracy)**

11        100.   Plaintiff incorporates by reference all the preceding paragraphs of

12  this Complaint as though fully set forth herein.

13        101.   Defendants have all conspired against Plaintiff PSH for varying

14  reasons or motivations and in varying ways but with the same goal of harming

15  Plaintiff PSH with respect to the Sunshine Transaction and its lawful operation

16  and ownership of the Restaurants and/or the larger U.S. Transaction.

17        102.   Defendants have engaged in a coordinated attack on PSH and

18  although not all Defendants are equally involved in or have knowledge of the full

19  scope of the illicit scheme, they all share a common scheme of harming PSH and

20  its interests.

21        103.   Each Defendant has committed at least one tortious act in

22  furtherance of this conspiracy.

23        104.   Defendants' conspiratorial scheme has caused and is continuing to

24  cause damage to Plaintiff PSH.

25        105.   Accordingly, each and every one of Defendants can and should be

26  held fully accountable for the damages caused by the conduct of each and every

27  one of their co-conspirator Defendants.

28

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1. For general, compensatory, consequential, exemplary, punitive, and treble damages according to proof;
2. For attorneys' fees and costs pursuant to contract;
3. For Plaintiff's cost of suit; and
4. For such other relief as the Court may deem just and proper.

Respectfully submitted,

May 27, 2019                    **WILSON KEADJIAN BROWNDORF LLP**

By: _____

BENJAMIN M. CUTCHSHAW
bcutchshaw@wkbllp.com
1900 Main Street, Suite 600
Irvine, California 92614
*Attorneys for Plaintiff*
Plutos Sama Holdings, Inc.

1

2
## DEMAND FOR JURY TRIAL

3
Plaintiff hereby demands a trial by jury on all causes of action herein.

4

5
May 27, 2019                    **WILSON KEADJIAN BROWNDORF LLP**

6

7

8
By: _____

9
BENJAMIN M. CUTCHSHAW

10
bcutchshaw@wkbllp.com

1900 Main Street, Suite 600

11
Irvine, California 92614

*Attorneys for Plaintiff*

12
Plutos Sama Holdings, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28